# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 21-1176V

| | |
|---|---|
| KYLE HIRST,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: December 1, 2025 |

*Leigh Finfer*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Austin Egan*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On April 9, 2021, Kyle Hirst filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") following his receipt of an influenza ("flu") vaccine on October 14, 2020.

After review of the record and consideration of the parties' arguments, I conclude that Petitioner's shoulder pain more likely than not began within 48 hours of vaccination. Petitioner has also established all other requirements for a Table SIRVA. Accordingly, he is entitled to compensation, and the motion for a ruling on the record is **granted.**

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**I.      Procedural History**

On February 3, 2022, this case was assigned to the Special Processing Unit of the Office of Special Masters. ECF No. 12. An initial status conference was held on May 4, 2022. ECF No. 15. Petitioner thereafter filed additional records. After delay to Respondent's medical review, on April 6, 2023, Respondent filed a status report indicating that he was amenable to informal resolution of the claim and the parties attempted settlement negotiations. *See* ECF No. 30. However, on September 13, 2023, Petitioner reported that the parties had reached an impasse. ECF No. 35. On November 13, 2023, Respondent filed a Rule 4(c) Report opposing compensation. ECF No. 36 ("Rule 4(c) Report").

On June 11, 2024, I set this matter on a briefing schedule to address the issue raised in Respondent's Rule 4(c) Report. Petitioner filed a motion for a ruling on the record on July 26, 2024. ECF No. 39 ("Pet'r Mot."). Respondent filed a response to this motion on September 26, 2024. ECF No. 44 ("Resp't Opp'n"). Petitioner did not file a reply. The matter is now ripe for adjudication.

**II.     Relevant Evidence**

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

At the time of vaccination, Petitioner was 32 years old and worked at the San Francisco headquarters of Genentech, a biotechnology company, as a scientist. *See* Ex. 4 at 12; Ex. 5 at 3. On October 14, 2020, Petitioner received a flu vaccine in his left arm at a clinic set up for this purpose on Genentech's campus. Ex. 1 at 1; Ex. 3 at 4. Petitioner had a history of mild asthma and was undergoing testing for fatty liver. *See* Ex. 4 at 3-4, 12. Petitioner did not have any history of a prior injury or pain in his right shoulder.

On November 12, 2020 (29 days after vaccination), Petitioner had an appointment with his primary care physician ("PCP"), Dr. Stephen Carney. Ex. 4 at 12. Petitioner reported "left shoulder pain x 1 month." *Id.* Dr. Carney also noted that Petitioner did not "recall [an] injury." *Id.* Dr. Carney believed Petitioner was suffering from a rotator cuff injury, recommended ibuprofen, and referred him to an orthopedist. *Id.* at 13. Petitioner declined a steroid injection at this time. *See id.*

A week later, on November 19, 2020, Petitioner saw orthopedist Dr. Dirk Diefendorf. Ex. 5 at 3. Petitioner stated that he received the flu vaccine in his left arm "about 1 month ago." *Id.* Dr. Diefendorf wrote that Petitioner "was very sore after the shot and acute pain lasted 5-7 days. The soreness has subsided but he still has lateral deltoid aching and pain." *Id.* Petitioner also described difficulty and discomfort with moving his shoulder, particularly cross-body adduction. *Id.* Dr. Diefendorf assessed Petitioner as having "[p]robable left shoulder post injection deltoid myositis." *Id.* Dr. Diefendorf recommended that Petitioner use heat on his shoulder twice a day and increase his dose of ibuprofen for 10-12 days. *Id.*

On November 20, 2020, Petitioner saw a nurse at the Genentech health center. Ex. 6 at 18. Again, Petitioner reported that after receiving the October 14, 2020 vaccine, "his arm felt very sore for a few days," and by a week later this acute pain was replaced with a dull, chronic aching. *Id.* Petitioner was also unable to lift his left arm above his head. *Id.* Petitioner stated that he "put up" with these symptoms for a few weeks until he went to see his PCP. *Id.* Petitioner was referred to physical therapy ("PT"), which was also provided at the Genentech campus. Ex. 6 at 20.

On November 23, 2020, Petitioner saw another nurse at the Genentech health center. *See* Ex. 6 at 92. Petitioner stated that "on 10/13/20, he developed L shoulder/arm discomfort after receiving the [f]lu vaccine at work." *Id.* The nurse assessed a "possible SIRVA." *Id.* Petitioner was given a worker's compensation packet and he submitted a claim shortly thereafter. *See id.* Petitioner's treatment was then coordinated and authorized through Genentech and its insurer. *See id.* at 92-100. The records and emails from the Genentech health center repeatedly listed the date of the worker's compensation-related "incident" as October 13, 2020, not October 14, 2020.

Petitioner also had his first PT session, remotely by video, on November 23, 2020. Petitioner described pain "beginning following work sponsored flu shot injection to the upper left arm area."[3] Ex. 6 at 92. This pain limited his ability to move his arm, sleep, open doors, lift his child, and perform lab work. *Id.* The physical therapist recommended PT once per week for six weeks. *Id.* at 22. Petitioner participated in five more remote telehealth PT sessions through January 8, 2021.[4] *Id.* at 20-68.

On December 14, 2020, Petitioner saw his PCP, Dr. Carney, for an annual physical. Dr. Carney noted "[o]ngoing severe left shoulder pain induced by flu vaccine

---

[3] The PT assessment stated that the date of Petitioner's injury was October 13, 2020. Ex. 6 at 20. This date is repeated throughout Petitioner's PT notes.

[4] Petitioner was also seen again at the Genentech health center on November 30, 2020. *Id.* at 92. At this appointment, he was prescribed tramadol. *Id.*

given at work." Ex. 4 at 6. Dr. Carney also commented that Petitioner had a "vaccine complication – flu shot work related," and that he would not receive his pneumococcal vaccine until he recovered from "vaccine complication/shoulder pain." *Id.* at 10.

At Petitioner's request, the Genentech health center referred him to an orthopedist.[5] Ex. 6 at 95. Petitioner saw Dr. Shabi Khan at Peninsula Orthopedic Associates on January 19, 2021. Ex. 7 at 9. Dr. Khan stated that Petitioner's left shoulder symptoms "began in and around the time of a flu shot for him. However classic rotator cuff and impingement type of history thereafter." *Id.* Dr. Khan indicated that the date of Petitioner's injury was October 13, 2020. *Id.* Dr. Khan diagnosed left shoulder impingement with possible rotator cuff and/or labral pathology, took x-rays, and administered a steroid injection. *Id.*

On Dr. Khan's orders, Petitioner underwent an MRI on February 4, 2021. Ex. 7 at 22-23. The MRI found that Petitioner did not have a rotator cuff tear, but did have a "posterior inferior quadrant labral tear with a few tiny paralabral cysts between the 9-7:00 positions." *Id.*

On February 22, 2021, Petitioner saw Nurse Practitioner ("NP") Michael Wang at Peninsula Orthopedic Associates. Ex. 7 at 7. Petitioner stated that he continued to experience "left shoulder discomfort nearly 4 months from a flu shot injection." *Id.* Petitioner reported that he was "virtually not using his left shoulder for any activities to prevent his left shoulder pain from worsening" and as a result was experiencing pain in his right shoulder from overcompensating. *Id.* NP Wang diagnosed Petitioner with impingement syndrome of the right shoulder and authorized additional PT for both shoulders.[6] *Id.* at 8. Petitioner had 23 sessions of PT between March 5, 2021 and September 8, 2021. Ex. 8 at 10-50; Ex. 14 at 55-60; Ex. 16 at 11-62. Petitioner also saw NP Wang for follow-up appointments on March 29, 2021 and May 10, 2021.[7] Ex. 7 at 5-6; Ex. 10 at 5-6.

On May 20, 2021, Petitioner saw Dr. Marko Bodor, a physical medicine and rehabilitation physician, for a second opinion. Ex. 11 at 3. Petitioner recounted that he had immediate pain in his left shoulder after the vaccination and "exquisite pain" the next day and thereafter. *Id.* After examination, review of the MRI results, and performing an

---

[5] Petitioner also saw one of the Genentech health center nurses on January 15, 2021. *Id.* at 100. Petitioner stated that his symptoms had improved over the holidays, but had then worsened again. *Id.*

[6] Petitioner also was referred to a psychiatrist to discuss his anxiety and depressed mood related to his left shoulder pain, physical limitations, and concerns about his medical treatment. *See* Ex. 9 at 8-29.

[7] NP Wang ordered an MRI of Petitioner's right shoulder, which revealed rotator cuff tendinosis and mild bursitis. *See* Ex. 10 at 8-9.

ultrasound of the most painful area of Petitioner's left shoulder, Dr. Bodor believed that Petitioner's pain was "multifactorial," but likely caused by inflammation stemming from the flu vaccine. *Id.* at 4. After discussing various treatment options, Dr. Bodor injected a small amount of local anesthetic into an area on Petitioner's infraspinatus capsular junction and also administered a glenohumeral steroid injection. *Id.*

On June 18, 2021, Petitioner returned to Dr. Bodor and underwent an ultrasound-guided left shoulder ultrasonic aspiration and debridement of the infraspinatus tendon and adjacent bone (Tenex procedure). *Id.* at 2. Dr. Bodor reported that after the procedure, Petitioner was able to move his shoulder without difficulty. *Id.*

Petitioner saw Dr. Khan on June 21, 2021. Ex. 14 at 5. Dr. Khan recommended conservative management of the left shoulder for the next six weeks to see how Petitioner reacted to the Tenex procedure. *See id.* The remainder of the appointment focused on Petitioner's right shoulder. *See id.* Petitioner had his next follow-up with NP Wang on July 9, 2021. *Id.* at 9. Petitioner reported that his left shoulder was "feeling generally well" and that he had been able to swing an axe while on a recent camping trip. *Id.* His right shoulder was stable, but still painful, and so NP Wang administered a right shoulder steroid injection. *Id.*

Petitioner had a brief telehealth appointment with Dr. Bodor on July 23, 2021. Ex. 15 at 16. Petitioner indicated that his left shoulder had improved after the Tenex procedure, but then regressed after some exercise and physical activity. *Id.* Dr. Bodor recommended that Petitioner continue with PT for "shoulder mechanics and stretching for adhesive capsulitis." *Id.*

On August 16, 2021, Petitioner saw NP Wang and reported that he now had nearly full range of motion in his left shoulder, but continued to have pain and discomfort when raising his arm. Ex. 14 at 15. NP Wang requested authorization for an arthroscopic labral repair, which would potentially involve other related procedures. *Id.* On September 10, 2021, Petitioner had another appointment with NP Wang to discuss his questions regarding surgery and the pre- and post-operative instructions. *Id.* at 20.

Petitioner saw Dr. Bodor on September 28, 2021. Ex. 15 at 13-14. Dr. Bodor did not recommend that Petitioner undergo the labral repair surgery and instead believed that Petitioner's symptoms were being caused by residual adhesive capsulitis. *Id.* Dr. Bodor suggested that Petitioner obtain a second opinion from Dr. John Costouros, "an orthopedic surgeon who specializes in SIRVA." *See id.* At an appointment on October 4, 2021, Dr. Costouros agreed with Dr. Bodor and recommended that Petitioner pursue steroid injections and a passive stretching program instead of surgery. Ex. 17 at 13.

Following this advice, Petitioner informed Peninsula Orthopedic Associates that he had decided not to move forward with surgery. *See* Ex. 14 at 26. However, he continued to be seen by NP Wang for follow-up appointments on November 3, 2021, December 9, 2021, January 20, 2022, March 3, 2022, and April 14, 2022. *See id.* at 26-41. On November 23, 2021, Petitioner underwent a second left shoulder MRI, with contrast, which showed a posterior labral tear, humeral head subluxation, and rotator cuff tendinosis. *Id.* at 15.

During the same time period, Petitioner received additional steroid injections from Dr. Bodor on October 14, 2021, and December 22, 2021. *See* Ex. 15 at 6-12. Petitioner informed Dr. Bodor that these injections were providing significant improvement, although he still had some pain and stiffness. *Id.* at 7. Petitioner also began a third round of PT and participated in 11 sessions between February 22, 2022 to May 4, 2022. Ex. 16 at 72-154. Petitioner reported improvement from this PT to NP Wang. *See* Ex. 14 at 38.

Petitioner did not file any further medical records beyond May 4, 2022.

Petitioner has offered a declaration in support of the claim.[8] This declaration was rather cursory and legalistic in its phrasing, however, and simply stated that Petitioner developed left shoulder pain within 48 hours of vaccination. Ex. 1 at 1. Petitioner then filed a second declaration with his July 2024 motion for a ruling on the record. Here, Petitioner provided more details about the onset of his left shoulder pain. *See* Ex. 18 at 1.

In this second declaration, Petitioner described that he and his colleagues experienced lengthy wait times to receive their flu vaccines and Petitioner felt that the nurses were rushing. *Id.* Petitioner also recalled that he was sitting while the administrator was standing and that it was more painful than other vaccines that he had received. *Id.* According to Petitioner, "[i]n the days immediately following the vaccine," he had "substantial pain and discomfort, including swelling, tenderness and limited range of motion." Petitioner also explained that he did not seek treatment right away because he hoped the symptoms would improve on their own and because it was difficult to schedule a non-emergency appointment due to the COVID-19 pandemic. *Id.* at 2. Finally, Petitioner stated that he told Dr. Carney that he had not sustained any injuries to his left arm because he had not had any kind of accident and did not know that a flu vaccine could cause an injury. *Id.*

---

[8] Petitioner's declarations state that they were signed under penalty of perjury, but do not reference 28 U.S.C. § 1746. Ex. 1 at 1; Ex. 8 at 1.

6

### III.     Analysis

#### A.     SIRVA Legal Standard

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). If a petitioner establishes a Table injury, causation is presumed.

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. *Id.* at 13(b)(1). Further, a special master may find that "the first symptom or manifestation of onset . . . described in a petition occurred within the time period described in the [Table] even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." *Id.* at 13(b)(2).

"Medical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Such records "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions" and are "generally contemporaneous to the medical events." *Id.* Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).

However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* at *19. And the Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993). The special master is obligated to fully consider and compare the medical records, testimony, and all

other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Vaccine Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). A Table SIRVA claim requires proof of onset of shoulder pain within 48 hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii). The criteria establishing a SIRVA under the accompanying qualifications and aids to interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

## B. Petitioner Has Established by Preponderant Evidence the Onset of Right Shoulder Symptoms Within 48 Hours Post-Vaccination

The only Table SIRVA element that Respondent disputes is onset. Rule 4(c) Report at 8; Resp't Opp'n at 8-10. Respondent's primary objection is based on Petitioner's initial appointment with Dr. Carney on November 12, 2020. Respondent argues that this appointment took place 29 days after vaccination, but Petitioner reported pain for approximately one month, and failed to "link his shoulder pain to his vaccination" by denying any specific injury. *See id.* In light of this lack of linkage at the first appointment, any other instance in which Petitioner reported that the pain began shortly after vaccination must be a "conclusion after-the-fact." *See* Rule 4(c) Report at 8.

Respondent's argument is unconvincing for numerous reasons. If Respondent is suggesting that Petitioner's pain actually began pre-vaccination due to the description of one month instead of the exact 29 days, there is no evidence to support this conclusion. Indeed, Respondent admits that Petitioner had no history of left shoulder problems. *See* Rule 4(c) Report at 2. Further, a 29-day treatment delay is relatively short for a SIRVA case. It is not uncommon for SIRVA claimants to believe that their symptoms will resolve on their own, and therefore not seek medical care immediately after vaccination. Here, Petitioner provided a reasonable explanation for the delay. *See* Ex. 18 at 2. Petitioner also did not have any intervening appointments, and there are is no record of any alternative, later onset. Nothing about the timing of the November 12, 2020 appointment undermines Petitioner's claim.

I also do not find Respondent's emphasis on Petitioner's purported failure to initially associate his left shoulder pain with the vaccination to be persuasive. There is no requirement in the Vaccine Program that a petitioner specifically *blame* a vaccination when seeking treatment, as long as his reports do not implicate some other cause of the symptoms. Again, claimants often do not expect the vaccination to have caused their injury. Respondent's argument also runs counter to the fact that causation is presumed in Table cases.

Respondent further unduly discounts all of Petitioner's other statements regarding onset. Only one week after the initial appointment with Dr. Carney, Petitioner provided greater detail about the onset of his pain to the Genentech health center nurse, Dr. Diefendorf, and the physical therapist, making it clear to these treaters that it began within 48 hours of the vaccination. *See* Ex. 5 at 3; Ex. 6 at 18, 20. I do not find that there is any conflict between how Petitioner initially described his pain and these slightly later reports, such that they should be considered unreliable or afforded less weight. *See* Rule 4(c) Report at 8.

Nor is Petitioner attempting to rebut medical records through his declaration testimony, as Respondent contends. *See* Resp't Opp'n at 9. Petitioner's denial of any specific injury, which he reasonably understood to mean a fall or accident, does not undermine his description of when the pain actually began. *See id.* at 9-10. Throughout his entire course of treatment, Petitioner consistently reported left shoulder pain that started very shortly in time after vaccination. Petitioner made these statements for the purpose of obtaining medical treatment and I give them significant weight on that basis.

Finally, Respondent makes the corollary argument that that references to October 13, 2020 as the date of vaccination or injury in the medical records illustrate Petitioner's "lack of precision in recalling his pain onset." Rule 4(c) Report at 8. It is unclear in many of these records whether Petitioner or the medical office incorrectly recorded the date. Regardless, an error of one day for the vaccination date itself does not speak to Petitioner's ability to remember that his pain began immediately after that event, whenever the vaccination actually occurred. A disparity of more than a day or two between the true vaccination date and what a record sets forth would be needed to give weight to this argument – and even then, records often do contain mistakes about vaccination dates that are not insurmountable obstacles to a favorable onset finding.

## Conclusion and Scheduling Order

Respondent does not raise any other objections to entitlement. *See generally* Rule 4(c) Report. Based on my independent review, I find that Petitioner has preponderantly established all requirements for a Table SIRVA claim. 42 C.F.R. § 100.3(c)(10). Accordingly, he need not prove causation-in-fact. Section 11(c)(1)(C). I also find that Petitioner has satisfied all other statutory requirements. Section 11(c)(A), (B), and (D).

For the foregoing reasons, **I find that Petitioner has established entitlement and is thus entitled to compensation for a left-sided Table SIRVA following the October 14, 2020 flu vaccine administration.** Petitioner's motion for a ruling on the record is **granted.**

The case is now formally in the damages phase. The parties are encouraged to pursue informal resolution of an appropriate damages award. If the parties determine that informal resolution is not possible, they should be prepared to promptly brief the appropriate award of damages.

**By no later than Friday, January 2, 2026**, Petitioner shall file a Status Report updating me on the parties' efforts towards informally resolving damages.

    **IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
